UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

John C. Grega,               :
          Petitioner,        :
                             :
     v.                      :    File No. 1:04-CV-2
                             :
Robert Hofmann,              :
Commissioner, Vermont        :
Department of Corrections,   :
          Respondent.        :

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Papers 62, 117 and 118)

Petitioner John C. Grega, through counsel, brings before the Court his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 1995, Grega was convicted of sexually assaulting and murdering his wife.  The sexual assault conviction was vacated by the Vermont Supreme Court on double jeopardy grounds.  Grega's state court efforts to vacate the murder conviction have been unsuccessful, and he remains incarcerated on a sentence of life without parole.

Grega's petition submits four grounds for relief.  Those grounds include: denial of his right to a public trial; denial of his right to a fair and unbiased jury; denial of his right to the timely disclosure of exculpatory evidence; and denial of his right to present

the jury with evidence of third-party culpability.[1]  The
respondent opposes the petition, arguing lack of
exhaustion with respect to all but one claim, and lack of
merit on all claims.  For the reasons set forth below, I
recommend that Grega's petition be DENIED.

Factual Background

In 1994, John Grega, his wife Christine, and their
young son, John Jr., were living in Lake Grove, New York.
In September of that year, the family traveled to upstate
New York and Vermont to view the fall foliage.  On
Saturday, September 10, they arrived in Vermont at a ski
condominium near Mt. Snow.  The condominium was owned by
Grega's business partner, and the Gregas planned to stay
for a few days.  Grega later told police that he and his
wife had discussed divorcing, and that one reason for the
trip was to get their marriage "back on track."

The facts of Christine Grega's murder and the
ensuing events were summarized by the Vermont Supreme
Court as follows:

On September 12, 1994, around 8:30 pm, a police

_____

[1]  Grega has moved to dismiss two additional claims
(Papers 117 and 118).  These motions are unopposed, and I
recommend that they be GRANTED.

officer responded to an emergency call reporting
that a woman had fallen in a bathroom.  When the
officer entered the Gregas' condominium, he
found defendant in the bathroom straddling the
victim's body.  Defendant was emotionally upset,
calling out his wife's name, shaking her, and
crying.  The victim was lying on her back on the
floor of the bathroom, with her head near the
door and her feet near the tub.  She was nude,
but partially covered by a towel and blanket.
According to the officer, the victim's body was
"purplish, bluish, gray" in color and extremely
cold, which surprised him, because the bathroom
heater was running and the bathroom was very
hot.  The officer also noticed bruising on the
victim's upper body.  The officer concluded from
the victim's body temperature and his other
observations that it was too late to attempt to
resuscitate the victim. A rescue worker who
arrived a few minutes later did attempt CPR,
unsuccessfully.

An autopsy of the victim revealed blunt trauma
injuries to the head, face, neck, trunk, and
extremities.  The neck area had suffered
extensive internal and external injuries.  There
were also multiple lacerations in the
anal/rectal region.  The medical examiner
concluded that the cause of death was asphyxia,
and classified the death as a homicide.  A
forensic pathologist called by the State
testified that the anal injuries were caused by
a foreign object about twice the size of a
normal penis, such as a fist, pipe, or baseball
bat, that was inserted in the rectum with a
moderate to severe amount of force.

Police searches of the crime scene and
condominium unit revealed additional evidence.
The condominium was unusually clean for a crime
scene and had apparently been wiped down.  There
were no signs of a struggle or forced entry.
The washing machine was stopped mid-cycle,
half-full of soapy water, and contained several

3

towels and some clothing.  The clothing, which
included a full set of women's clothes and a
full set of men's clothes, matched the clothing
worn by defendant and the victim in photos taken
the day of the murder.   The pair of men's
shorts was missing a button that was present
when the photos were taken.  Investigators found
money and a pair of keys in the pair of women's
blue jeans.   A pair of women's underwear, a
pair of men's shorts, and a towel found in the
washer all tested positive for blood.  Forensic
testing of the clothing and blood was hindered,
however, because the clothing had been soaking
in soapy water, which dissolved proteins.

A search of the common trash receptacle for the
condominium complex turned up a garbage bag
identical to those found inside the condominium
unit.  The bag contained beer cans, some empty
and some full, one of which carried defendant's
fingerprints.  The garbage also contained paper
towels that appeared to be stained with blood,
and a panty liner that tested positive for
blood.  A rescue worker discovered that the
toilet in the upstairs bathroom of the
condominium was stopped up.  The toilet
eventually had to be broken to discover the
source of the blockage.  It contained a wad of
paper towels.  Investigators also found a piece
of cardboard from a box of Marlboro cigarettes
stuck to the inside of the toilet.

Defendant spoke with police several times during
the investigation.  According to defendant's
statements the night his wife was killed, he
left the condominium with his son in the late
afternoon to give his wife a chance to relax.
He took his son to a nearby school playground,
and then drove around looking for a place to
eat.  They stopped at an ice cream stand, but it
was closed.  After about an hour and a half,
they returned to the condominium.  Defendant was
not exactly sure what time they returned, but
thought it was around 7:00 pm.  He recalled that

it was getting dark and his son was sleeping.
The door to the condominium unit was unlocked,
and he entered quietly, not wanting to disturb
his wife if she was napping.  He left his son
sleeping in the car.  He went downstairs to look
for his wife and found her in the bathroom.  He
could not remember whether his wife was
partially out of the tub, or whether she was
face down or face up.  He did remember that the
tub was partially full, and that he pulled his
wife out of the tub and laid her on the floor.
He tried to resuscitate her, and then ran next
door to have the neighbors call an ambulance.
He brought his son over to the neighbors, and
then returned to his wife.  At some point he
covered his wife up with a blanket.

Later that night, having learned of the victim's
anal injuries, an officer questioned defendant
about his sexual relations with his wife.  At
first he stated that he and his wife had sex
twice that morning; later in the same interview
he stated that they had vaginal sex once in the
morning and anal sex once that afternoon, before
defendant left with his son.  Defendant
commented on the large size of his penis,
claiming that prostitutes had turned him away
because of its size, and stated that his penis
may have had blood on it after he withdrew from
the anal sex.  He permitted the officers to
examine his penis, and the officers observed no
bruising and saw no blood on his penis or his
underwear.

The police questioned defendant again the next
evening.  When asked about the injuries to his
wife's neck, defendant explained that he
sometimes grasped his wife's neck during sex,
and she would say "stop" if it was too rough.
He stated that he did this during sex on the day
his wife died.  He also said that his wife's
head injuries may have been caused by her
hitting a wall or the bed during sex.

5

Defendant gave a final statement to the police the next month, in the presence of his attorneys.  His description of the timing of events changed somewhat, with defendant claiming that the episode of anal sex and his trip with his son occurred later in the day than he had originally stated.  At this point he also said that he did not have his hands around his wife's neck while having sex with her, and that after sex his wife was in fine condition, not disabled or in pain, and had dressed again in her jeans and golf shirt.

In December, 1994, defendant was charged with second-degree murder of his wife.  He pled not guilty.  The information was later amended to charge defendant with aggravated murder and aggravated sexual assault.  After a lengthy trial, a jury found defendant guilty on both counts.

State v. Grega, 168 Vt. 363, 366-69 (1998).

Grega now highlights the fact that the evidence against him was purely circumstantial.  He also submits that there was evidence of third-party perpetrators, but that "the State either declined to investigate it, refused to disclose it, prejudicially delayed its disclosure, or the court improperly excluded it from trial."  (Paper 107-1 at 7).  Specifically, Grega contends that there was "significant evidence" to suggest that two other men, Bryant Comi and Michael Carpenter, were responsible for his wife's murder.  As Grega argues in his brief,

Mr. Comi: was in the vicinity of the condo where
the Gregas were staying at the time of the
murder; had a substantial violent criminal
record; had a history of sexual aggression
towards women; smoked Marlboro cigarettes
(linking him to the Marlboro carton piece found
clogging the upstairs toilet); had burglarized
at least one other condo unit in the same
complex in the past; was unaccounted for at the
time of the murder; and may have **confessed the
killing to his former girlfriend Jacqueline
Brice**.

The day of the murder, Bryant Comi and his
coworker Michael Carpenter were painting the
condo complex where the Gregas were staying.
When interviewed about the murder, they gave the
police fraudulent addresses and fraudulent phone
numbers.  They provided inconsistent statements
about whether they had seen John Grega's red
Volkswagen parked at the condo around the time
of the murder.  They told inconsistent stories
about what parts of the condo they had been
painting.  Both lied about when they had arrived
home from work that night.  Comi and Carpenter
claim to have left work between 4:00 and 5:00
the day of the murder for the one hour trip back
to their residences in Bennington.  However,
Daisy Carpenter, Michael Carpenter's wife,
testified that the two men arrived home
atypically late from work the day of the murder,
around 8:00 or 8:30 p.m.  Daisy Carpenter
further testified that Michael Carpenter was
unusually agitated the night of the murder -- so
much so that Daisy and Michael got in a fight
resulting in Michael leaving the house and
sleeping elsewhere.  Even more disturbingly,
Bryant Comi himself testified that when he
arrived home that night, he "may have joked
about the death of a lady and joked that he had
killed the lady" to his girlfriend.

(Paper 107-1 at 8-9) (record citations omitted)

(parentheticals and emphasis in original).

Grega argues that the State's investigation of Comi and Carpenter was "superficial and last minute." Id. at 9. Results of the investigation were not disclosed to the defense until a few days before jury selection. Grega now contends that the State's untimely disclosures violated his rights under Brady v. Maryland, 373 U.S. 83, 84 (1963). Grega also argues that the trial court erred when it excluded evidence and testimony pertaining to the possible involvement of Comi and Carpenter in the murder.

Grega further protests events that occurred during jury selection. Specifically, he contends that the court (1) should have held a competency hearing for John Grega Jr. prior to *voir dire*, and (2) failed to remove jurors for cause after they stated that they had business and personal relationships with State witnesses. Finally, Grega challenges the state court's exclusion of his family from the trial.

### Discussion

I.  <u>Exhaustion</u>

The first issue before the Court is that of exhaustion.  A federal court should not grant a writ of

habeas corpus unless the petitioner has exhausted his
state court remedies.  <u>See</u> § 2254(b)(1)(A).  To meet this
exhaustion requirement, a petitioner must have presented
the state courts with "the same claim he urges upon the
federal courts," as a way of giving the state court "an
initial opportunity to pass upon and correct alleged
violations of its prisoners' federal rights."  <u>Picard v.
Connor</u>, 404 U.S. 270, 275-76 (1971) (internal citations
omitted); <u>see also</u> <u>Jones v. Keane</u>, 329 F.3d 290, 295 (2d
Cir. 2003).  In order to have "fairly presented" federal
claims to the state courts, a petitioner must have (1)
"set forth in state court all of the essential factual
allegations asserted in his federal petition," and (2)
"placed before the state court essentially the same legal
doctrine he asserts in his federal petition."  <u>Daye v.
Att'y Gen. of New York</u>, 696 F.2d 186, 191-92 (2d Cir.
1982) (<i>en banc</i>).  "[T]he nature or presentation of the
claim must have been likely to alert the court to the
claim's federal nature."  <u>Id.</u> at 192.  The Second Circuit
has interpreted the exhaustion requirement as requiring a
petitioner to "present the substance of the same federal
constitutional claims that he now urges upon the federal

courts to the highest court in the pertinent state."
Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001)
(internal quotation marks and citations omitted).

The respondent contends that Grega failed to bring
several of his claims to the Vermont Supreme Court.
Specifically, the respondent argues that "[w]ith the
exception of the claim relating to the trial court's
refusal to allow impeachment of Comi and Carpenter, *all*
claims are *unexhausted*." (Paper 115-1 at 20) (emphasis
in original). In response, Grega argues (1) that the
respondent has explicitly waived the exhaustion argument,
and (2) that he has, in fact, exhausted his habeas
claims.

A.  Waiver

Under the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA"), "[a] State shall not be deemed to
have waived the exhaustion requirement or be estopped
from reliance upon the requirement unless the State,
through counsel, expressly waives the requirement." 28
U.S.C. § 2254(b)(3). Grega argues that, in this case,
the respondent has waived the exhaustion defense by
asserting in prior filings that certain issues were

addressed by the Vermont Supreme Court.   For example, in his initial motion to dismiss, the respondent asserted that Grega's jury selection claim had been "adjudicated by a state court.   The Vermont Supreme Court considered the Petitioner's claim on the merits and affirmed the lower court decision."   (Paper 16 at 9).   The respondent made similar statements with respect to Grega's claims regarding his right to a public trial and the exclusion of evidence pertaining to Comi and Carpenter.   <u>Id.</u> at 7-8, 20.

The respondent is now represented by different counsel, and for the first time clearly asserts the exhaustion defense.   The question before the Court is whether the written statements by previous counsel qualified as explicit waivers of that defense under § 2254(b)(3).   As the Supreme Court has explained, "under pre-AEDPA law, exhaustion and procedural default defenses could be waived based on the State's litigation conduct." <u>Banks v. Dretke</u>, 540 U.S. 668, 705 (2004).   Now, however, counsel's conduct must be "explicit."   28 U.S.C. § 2254(b)(3).

In <u>Lewis v. Bennett</u>, 328 F. Supp. 2d 396, 405

(W.D.N.Y. 2004), an attorney for the respondent in a
habeas proceeding stated that "'petitioner has raised
each general issue in state appellate court.'"  The <u>Lewis</u>
court noted, however, that the petitioner had not
exhausted his claims of ineffective assistance of
counsel.  The court thus found itself "faced with an
ambiguous statement from respondent's counsel, a
statutory directive that the exhaustion waiver must be
explicit, and clearly unexhausted claims . . . ."  328 F.
Supp. 2d at 405.  Given these facts, and the plain
language of § 2254(b)(3), the court concluded that the
respondent had not "explicitly waived the exhaustion
requirement . . . ."  328 F. Supp. 2d at 405; <u>see also</u>
<u>Lurie v. Wittner</u>, 228 F.3d 113, 123 (2d Cir. 2000)
(counsel's statement that petitioner "did make these
arguments in the Appellate Division" was not explicit
waiver of exhaustion defense), <u>cert.</u> <u>denied</u>, 532 U.S. 943
(2001).

    Here, the statements by the respondent's previous
counsel were not made in the context of the exhaustion
issue.  Given that the statute requires an explicit
waiver, and because post-AEDPA law discourages waivers

based upon prior litigation conduct, the respondent's previous statements should not be read as an explicit waiver of the exhaustion defense.  I therefore recommend that the Court find the respondent has not explicitly waived this defense under § 2254(b)(3).

B.  Exhaustion of Claims By Direct Appeal

Grega submits that two of his habeas claims were exhausted in his direct appeal.  The respondent concedes that one of those claims, the trial court's refusal to admit evidence of prior bad acts and convictions of Comi and Carpenter, was properly exhausted.  (Paper 115-1 at 21).  Exhaustion on the second claim, the trial court's refusal to permit specific challenges for cause after denying Grega's request for additional peremptory challenges, is disputed.

In his brief on direct appeal, Grega stated that the trial court's rulings on the issue of peremptory challenges violated his "constitutional right to trial by impartial jury."  (Paper 115-5 at 4).  The respondent argues that Grega's brief referenced solely Vermont law, and therefore failed to alert the state courts to a federal claim.  (Paper 115-1 at 20-21).  Courts have

13

generally held that a federal claim may be "fairly present[ed] to the state courts . . . without citing chapter and verse of the Constitution" in several ways, including: "(a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar circumstances], (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Daye, 696 F.2d at 194; accord, Jones v. Vacco, 126 F.3d 408, 413-14 (2d Cir. 1997); Williams v. Lord, 996 F.2d 1481, 1483 (2d Cir. 1993), cert. denied, 510 U.S. 1120 (1994).

Here, Grega clearly asserted his right to trial by an impartial jury.  The Vermont Supreme Court has acknowledged that this right is guaranteed by the Sixth Amendment to the United States Constitution.  See State v. Holden, 136 Vt. 158, 161 (1978).  Grega's case citations in his direct appeal relied heavily on the Holden decision.  (Paper 104-18 at 17-18, citing State v. Doleszny, 146 Vt. 621 (1986) and State v. McQuestern, 151

14

Vt. 267 (1989)).  Given Grega's clear assertion of this
well-known right, and the Vermont courts' recognition
that the right is guaranteed by the federal constitution,
his argument on direct appeal appears to have been
presented "in terms so particular as to call to mind a
specific right protected by the Constitution," alleging
"a pattern of facts that is well within the mainstream of
constitutional litigation."  Daye, 696 F.2d at 194.  The
Court should therefore conclude that Grega properly
exhausted his claims pertaining to the peremptory
challenge issue.

    C.  Exhaustion of Claims By Post-Conviction Review

    Grega argues that his remaining claims were
exhausted in the course of his post-conviction review
("PCR") proceedings.  Grega submitted his initial PCR
petition *pro se*.  The respondent contends that the *pro se*
petition was replaced by a 124-page "preliminary
statement" submitted by Grega's court-appointed counsel.
When counsel submitted his preliminary statement, he
advised the state court that "this should replace the
previous filings in this matter."  (Paper 115-7 at 1).

    Counsel's submission in the PCR proceeding focused

on the effectiveness of trial and appellate counsel.  A
hearing was held, and both sides offered expert testimony
on the issue of ineffective assistance of counsel.  The
lower court found that Grega had not met his burden of
proof on his ineffective assistance claims, and the
Vermont Supreme Court affirmed.  The Vermont Supreme
Court also noted that Grega was challenging the
constitutionality of a Vermont statute, but declined to
address the issue since "petitioner raised solely the
issue of ineffective assistance of counsel with regard to
the constitutionality of [the statute], and failed to
raise below the specific issue petitioner now asserts."
In re Grega, 175 Vt. 631, 636 (2003).

     Grega is not bringing any claims of ineffective
assistance of counsel in his current habeas corpus
petition.  He argues, however, that his PCR petition
consisted of more than just the ineffective assistance
claims, and cites his initial *pro se* petition for
support.  The issues in question for purposes of the
current petition include Grega's public trial claim, his
claim regarding John Grega Jr.'s competency hearing, and
his Brady claim.

The exclusion of Grega's family members from the trial was presented as an issue before Vermont Supreme Court in Grega's *pro se* PCR appeal, both in his brief and at oral argument.  (Paper 107-5 at vii, 1-4); (Paper 104-25 at 3-7).  However, as the text of Grega's briefs before the lower court and the Vermont Supreme Court make clear, the issue was presented solely as part of an ineffective assistance of counsel claim.  In the lower court brief, counsel began the public trial argument by stating that "[a]ppellate counsel was also remiss in neglecting to argue that Petitioner was deprived of his constitutional right to public trial."  (Paper 115-8 at 1).  Grega himself, in his *pro se* appeal of the PCR ruling, discussed the issue in the context of counsel's ineffectiveness, arguing that "[t]he Superior Court erred in failing to address appellant counsel's ineffectiveness in failing to appeal the blatant violation of Appellant's constitutional right to a public trial . . . ."  (Paper 107-6 at 16).[2]  In keeping with these arguments, and as

---

[2]  Grega argues that the Superior Court acknowledged his discussion of other, "background" issues.  The lower court's only such acknowledgment, however, recognized that "Petitioner discusses other alleged *errors on the part of counsel* . . . ."  (Paper 115-16 at 1) (emphasis

noted above, both the lower court and the Vermont Supreme Court viewed Grega's PCR petition as primarily raising claims of ineffective assistance of counsel.

The Second Circuit has held that a post-conviction petition claiming ineffective assistance of appellate counsel does not exhaust the issues underlying the ineffective assistance claim. Turner v. Artuz, 262 F.3d 118, 123 (2d Cir.), cert. denied, 534 U.S. 1031 (2001). "A court considering ineffective assistance might never reach the underlying constitutional claims, and the rejection of the ineffective assistance claims without detailed comment does not bespeak any necessary ruling on the underlying constitutional claim." Id.; see also Shaw v. Superintendent, Attica Corr. Facility, 2007 WL 951459, at *9 (N.D.N.Y. Mar. 28, 2007); Williams v. Bennett, 2003 WL 21143070, at *5 n.4 (E.D.N.Y. Jan. 3, 2003). Here, Grega presented facts and case law with respect to his constitutional right to a public trial, but did so solely in the context of his ineffective assistance claim. Consequently, the public trial claim has not yet been

_____

added). Therefore, the "background" issues were viewed only as additional issues relating to Grega's ineffective assistance claims.

18

exhausted in state court.[3]

Grega's other PCR claims suffer a similar fate.  In his § 2254 petition, Grega alleges that the trial court "failed to hold a competency hearing for John Henry Grega Jr. prior to *voir dire*, thereby enabling the State to gain an unlawful prejudicial advantage by discussing the

---

[3]  Even if Grega's § 2254 petition had included a claim of ineffective assistance of appellate counsel with respect to the public trial issue, the Court's review of the trial transcript finds little support for such a claim.  Prior to trial, family members from both the victim's family and Grega's family were included on the witness lists, and were therefore excluded from the jury selection process.  In support of her ruling, the trial judge reasoned that "I don't think there should be any contact between jurors and prospective witnesses.  So if they are going to be witnesses, from both the State and the Defense and the prospective witnesses, excluded from the proceeding until after they've testified."  (7/12/95 Trial Tr. at 72-73).

It is not clear from the trial transcript whether defense counsel ever specifically objected to the Grega family's exclusion from the testimonial portions of the trial.  In fact, during argument on the issue of sequestration from jury selection, one of Grega's attorneys stated that the sequestration rule "is designed to prevent prospective witnesses from hearing the testimony of other witnesses.  There is no evidence, being adduced here at the jury selection."  (7/12/95 Trial Tr. at 72).  Moreover, it appears from the record that Grega's parents were permitted to attend opening statements.  (7/17/95 Trial Tr. at 27).  On the basis of these facts, the Court doubts whether there is sufficient support for a claim that, on direct appeal, counsel was constitutionally ineffective for failing to raise the public trial issue.

potential testimony of the accused's son – testimony which never took place." (Paper 62-1 at 10). Counsel raised this issue at trial and moved for a mistrial. The motion was denied, and the issue was not appealed.

In his PCR proceeding, Grega again argued that appellate counsel's failure to raise the issue on direct appeal constituted ineffective assistance of counsel. The PCR motion was denied, and the Vermont Supreme Court affirmed the lower courts findings of no clear attorney error. In reaching this conclusion, the Vermont Supreme Court endorsed the lower court's findings that "the substance of the child's testimony was never disclosed to the potential jurors, and that the jurors were specifically instructed to base their decision solely on the evidence presented." (Paper 104 at 6).

Although the claim was presented in the context of an ineffective assistance argument, Grega urges the Court to accept his initial PCR petition, and not counsel's supplemental filing, as the controlling document. The initial petition, however, does not save Grega on this claim. Grega is currently asking the Court to find that the state trial court committed error. In his PCR

petition, Grega presented the misuse of his son's
potential testimony as an issue of prosecutorial
misconduct.  (Paper 115-6 at 5).  Therefore, even if the
Court were to view the *pro se* PCR petition as the
controlling document, the question of trial court error
with respect to John Grega, Jr. was not brought directly
before the state courts.

Finally, Grega alleges that he was "denied his due
process right to the timely disclosure of exculpatory
evidence."  (Paper 62-1 at 11).  In his PCR petition, he
claimed that the prosecution's failure to timely disclose
evidence relating to Comi and Carpenter violated his
federal constitutional rights.  (Paper 115-6 at 6, 10).
PCR counsel raised the issue in terms of appellate
counsel's failure to appeal the prosecution's alleged
failures.  (Paper 115-9 at 15-16).  The lower court did
not specifically address the issue, presumably including
it as one of the "background" grounds for Grega's
ineffective assistance claim.  (Paper 115-16 at 1 n.1).
This claim was not the subject of expert testimony at the
PCR hearing.

The Vermont Supreme Court noted the <u>Brady</u> issue

21

specifically, and affirmed the lower court's general assessment of the so-called "background" grounds for relief.  In re Grega, 175 Vt. at 879.  The Vermont Supreme Court also cited the lack of expert testimony, and agreed with the lower court's determination that, absent such testimony, it was proper to conclude that "counsel's omissions . . . on appeal did not rise to the level of blatant ineffective assistance of counsel, as raising them would not have definitively resulted in reversal."  Id. at 635-36 (citations omitted). Accordingly, as presented to the Vermont courts, the issue of the prosecution's untimely disclosures was offered only as an ineffective assistance claim.

For the reasons set forth above, the Court should thus find that Grega's claims with regard to his public trial rights, the issues relating to John Grega Jr., and his Brady claim are unexhausted.

II.  Procedural Default

The respondent argues that in addition to these claims being unexhausted, they are procedurally defaulted.  Grega contends that the respondent cannot raise this argument because it was not asserted at the

22

outset of the case as an affirmative defense.  Courts in
this Circuit have determined that procedural default is a
matter that may be raised *sua sponte*.  See <u>Smith v.</u>
<u>Filion</u>, 2007 WL 274780, at *9 n.9 (N.D.N.Y. Jan. 26,
2007) (citing <u>Acosta v. Artuz</u>, 221 F.3d 117, 121 (2d Cir.
2000)); <u>see also</u> <u>Washington v. James</u>, 996 F.2d 1442, 1448
(2d Cir. 1993).  Further, the defense may be asserted
belatedly, and even when contrary statements have been
made earlier in the case.  <u>Washington</u>, 996 F.2d at 1448.
The defense may, therefore, be asserted in this case.

When a claim has never been presented to a state
court, a federal court may find that there is an absence
of available state corrective process under § 2254(b) "if
it is clear that the unexhausted claim is procedurally
barred by state law and, as such, its presentation in the
state forum would be futile." <u>Aparicio v. Artuz</u>, 269
F.3d 78, 90 (2d Cir. 2001) (citing <u>Reyes v. Keane</u>, 118
F.3d 136, 139 (2d Cir. 1997)).  If a state court has
rejected a claim as procedurally defaulted, the claim may
only be considered on federal habeas review upon a
showing of cause and prejudice, or upon a showing that a
miscarriage of justice will result if the claim is not

reviewed.  <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>Teague v. Lane</u>, 489 U.S. 288, 298 (1989).

The first step in this analysis is to determine whether Grega's unexhausted claims are procedurally barred in state court.  Under Vermont law, a claim that has not been raised on direct appeal is barred if, absent exigent circumstances, "the movant deliberately bypassed the issue on appeal."  <u>In re Stewart</u>, 140 Vt. 351, 361 (1981) (citing <u>Chin v. United States</u>, 622 F.2d 1090, 1092-93 (2d Cir. 1980), <u>Berard v. Moeykens</u>, 132 Vt. 597, 599-600 (1974)).  As the Vermont Supreme Court has explained, "post-conviction review is not a substitute for direct appeal."  <u>In re Carter</u>, 2004 VT 21, at ¶ 9 (2004).  More specifically,

> [w]here the issues raised in a petition for post-conviction relief were contested at trial and were not raised on appeal, they will not be addressed on post-conviction review unless it is demonstrated that the failure to raise them on direct appeal was inadvertent, that appellate counsel was ineffective, or that extraordinary circumstances excused the failure to raise the issues on appeal.

<u>In re Nash</u>, 149 Vt. 63, 64 (1987).

In this case, Grega has argued previously that on direct appeal, appellate counsel was ineffective for

failing to raise the unexhausted issues.  In other words,
Grega has charged appellate counsel with wrongfully
"bypassing" those issues.  He makes no claim that the
bypass was inadvertent, or that extraordinary
circumstances prevented him from raising the issue on
appeal.  As discussed above, his efforts to prove that
appellate counsel was ineffective have been unsuccessful.
Therefore, based upon the <u>Nash</u> standard, Grega is
procedurally barred from bringing his unexhausted claims
in State court.

This conclusion is reinforced by the state court's
refusal to hear Grega's second PCR petition.  In
November, 2002, Grega submitted a second PCR petition in
state court, arguing that the State failed to disclose
material fingerprint evidence from the crime scene, and
that analysis of this evidence "has exposed the existence
of possible false testimony by the State's fingerprint
experts who testified against him at trial."  (Paper 115-
16 at 3).  The state court rejected the petition in an
Entry Order, stating in relevant part:

> The issues which Petitioner seeks to raise by
> the present complaint for post-conviction relief
> were either explicitly rejected in this Court's
> prior decision [on Grega's first PCR petition],

25

> or rejected by implication because they could
> have been raised but were not adequately
> preserved.  The court is not required to
> entertain a second or successive motion for
> similar relief on behalf of the same prisoner.

(Paper 115-17) (citations omitted).

To avoid a procedural default on his unexhausted claims, Grega would have to "show 'cause' for the default and 'prejudice attributable thereto,' or demonstrate that failure to consider the federal claims will result in a 'fundamental miscarriage of justice,' i.e., a showing of 'actual innocence.'"  Harris v. Reed, 489 U.S. 255, 262 (1989) (citations omitted); accord, Schlup v. Delo, 513 U.S. 298, 324-27 (1995); see also Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006).  A petitioner may establish cause by showing "'that the factual or legal basis for a claim was not reasonably available to counsel . . . or that some interference by officials . . . made compliance impracticable.'"  Coleman, 501 U.S. at 753 (quoting Murray v. Carrier, 477 U.S. 478, 492 (1986)).  To satisfy the prejudice requirement, the alleged error must have worked to the petitioner's "actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  Torres v. Senkowski, 316

F.3d 147, 152 (2d Cir. 2003) (internal quotation marks omitted).

Grega does not argue cause for his failure to present the unexhausted issues to the Vermont Supreme Court.  In fact, he argues that the issues *were* presented in his PCR petition.  To argue cause for failure to raise these issues would, therefore, be inconsistent.

If the petitioner cannot show cause, the failure to raise the claim in an earlier petition may nonetheless be excused if he can show that a fundamental miscarriage of justice would result from a failure to entertain the claim, *i.e.*, "that he is actually innocent of the crime for which he has been convicted." Dunham v. Travis, 313 F.3d 724, 730 (2d Cir. 2002) (citing Schlup, 513 U.S. at 321).  This fundamental miscarriage of justice exception to the procedural default rule is "extremely rare," and should be applied only in "extraordinary circumstances." See Sweet v. Bennett, 353 F.3d 135, 142 (2d Cir. 2003) (citing Schlup, 513 U.S. at 321-22).

Although Grega insists upon his innocence, his unexhausted claims do not, standing alone, seek to establish actual innocence.  Those claims, again, are (1)

that his right to a public trial was denied when his
family was barred from the proceedings, (2) that the
trial court should have conducted a competency hearing as
to John Jr. prior to *voir dire*, and (3) that the
prosecution belatedly disclosed evidence of its
investigations in violation of <u>Brady</u>.  Taking each of
these claims in turn, the public trial issue, even if
considered, would not touch the question of actual
innocence.  The same can be said of the claim regarding
Grega's son.  In this claim, Grega alleges that the trial
court's failure to hold a competency hearing prior to
jury selection allowed the State to "gain an unlawful
advantage by discussing the potential testimony of the
accused's son – testimony which never actually took
place."  (Paper 62-1 at 10).  While this claim may
pertain to the fairness of the jury selection process, it
does not rise to a claim of actual innocence.

In his <u>Brady</u> argument, Grega contends that the
timing of the State's disclosures violated his right to
due process.  He does not claim that the State failed to
make the required disclosures, or that the timing of the
disclosures prevented the information from being

presented to the jury.  Grega's <u>Brady</u> claims focus on the
results of investigative interviews with Comi and
Carpenter, and on the notes of Sgt. William Pettengill,
the chief investigating officer in the murder
investigation.

As to the Comi interviews, Grega claims that the
State improperly delayed disclosing Comi's "joke" that he
had killed a woman.  However, the respondent argues, and
Grega does not dispute, that the defense team had been
made aware of Comi's comment prior to the State's
disclosure.[4]  Furthermore, counsel for both parties
discussed Comi's "joke" in their opening statements, and
Comi was reportedly cross-examined about his "joke" at
trial.  (Paper 108-8 at 19) (State's opening statement);
(Paper 115-2 at 35 n.12).

Grega has not specified the information that should
have been disclosed as a result of the Carpenter
interview.  With respect to Sgt. Pettengill's notes, the

---

[4]  The State interviewed Comi on June 30, 1995, and
disclosed Comi's comment on July 6, 1995.  (Paper 107-1
at 9).  The respondent reports that on June 29, 1995, one
of the defense attorneys spoke with the caseworker for
Comi's ex-girlfriend.  The caseworker revealed that,
according the ex-girlfriend, Comi said that he had
"killed some lady."  (Paper 115-2 at 9).

notes pertained to his interviews of five individuals,
including one of the painters who had worked with Comi
and Carpenter on the day of the murder.  Pettengill
initially testified at trial that he had been present
during these interviews, and that he had not taken notes.
Two days later, he produced his notes from the
interviews.  He was subsequently recalled as a witness,
and admitted to the belated disclosure.  The trial court
determined that the timing of the disclosure had not been
prejudicial.  (8/31/95 Trial Tr. at 2137-44).

Nothing in these facts suggests that, absent
Pettengill's untimely disclosure, Grega would have been
found innocent.  Indeed, the only specific sanction
requested by defense counsel was that the jury be told
the notes should have been disclosed earlier.  (7/26/95
Trial Tr. at 1342; 7/31/95 Trial Tr. at 1955).
Accordingly, this issue does not present the sort of
"extraordinary circumstances" that call for a merits
review notwithstanding the lack of cause and prejudice
related to Grega's procedural default.

When unexhausted claims are procedurally barred in
state court, they may be deemed exhausted and dismissed

by the federal court.  St. Helen v. Senkowski, 374 F.3d
181, 183 (2d Cir. 2004).  I therefore recommend that
Grega's unexhausted claims, *i.e.* his claims with regard
to his public trial rights, the issues relating to John
Grega Jr., and his Brady claim, be DISMISSED as barred
from habeas review.

III.  Exhausted Claims

The Court may reach the merits of Grega's exhausted
claims.  Those claims include (1) the allegation that the
trial court "failed to remove for cause jurors with
openly stated business and personal relationships with
key state witnesses" and (2) the claim that the trial
court denied Grega his right to present "evidence and
testimony demonstrating the likely involvement of Bryant
Comi and Michael Carpenter in the murder of Christine
Grega."  (Paper 62-1 at 10-11).[5]

The AEDPA narrowed the scope of federal habeas
review of state convictions where the state court has
adjudicated a petitioner's federal claim on the merits.

_____

[5]  The Court has concluded, in its discretion, that
an evidentiary hearing on these issues is not required.
See Shriro v. Landrigan, 127 S. Ct. 1933, 1940 (2007) (in
§ 2254 proceeding, decision to grant evidentiary hearing
rests in discretion of district court).

See 28 U.S.C. § 2254(d).  Under the AEDPA standard, the
reviewing court may grant habeas relief only where the
state court's adjudication of the federal claim on the
merits "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as
determined by the Supreme Court of the United States."
28 U.S.C. § 2254(d)(1).  Habeas relief is also warranted
if the state court's decision "was based on an
unreasonable determination of the facts in light of the
evidence presented in the State court proceedings," or
where the petitioner presents clear and convincing
evidence to rebut the presumption that state court
findings of fact are correct.  See 28 U.S.C. §
2254(d)(2); § 2254(e)(1).

A state court decision is an "unreasonable
application" of clearly established federal law if the
state court "identifies the correct governing legal
principle from [the Supreme Court's] decisions but
unreasonably applies that principle to the facts of [a]
prisoner's case."  <u>Williams v. Taylor</u>, 529 U.S. 362, 413
(2000).  Furthermore, "a federal habeas court may not
issue the writ simply because that court concludes in its

independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Gilchrist, 260 F.3d at 93 (citing Williams, 529 U.S. at 411); see also Yarborough v. Gentry, 124 S. Ct. 1, 4 (2003) (per curiam) ("Where . . . the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable.").

A.   Failure to Remove Jurors for Cause

On July 14, 1995, the fourth day of jury selection, juror Sandra Hanson stated that, as a result of her professional role as a banker, she knew "half a dozen" of the people on the State's witness list.  (Paper 108-7 at 5).  She also stated that she had once met one of the State's Attorneys.  Id. at 4.  That same day, juror Ruth Kirchner informed the trial court that one of the State's witnesses was her personal physician.  Id. at 17-18. Defense counsel asked Ms. Kirchner if she "would be offended if somebody said that he did something wrong," to which she responded, "Yes I would.  I would, very definitely so."  Id. at 19.  When the court inquired

further, Ms. Kirchner stated: "I would be very upset about it.  I think I'd almost be at the point where I'd stop going to him.  That's how much faith I have in this man and doing things right."  Id.  Ms. Kirchner explained, however, that she would not hold such a statement against either party, and only against the doctor himself.  Id. at 20.

The defense challenged both of these jurors for cause.  The trial court denied the challenges.  With respect to Hanson, the court found "no evidence supporting a challenge for cause."  (Paper 115-2 at 7, quoting trial transcript).  "Ms. Hansson [sic] says she knows who [State's Attorney] Fisher is from the community.  It would have no impact on her.  She saw an article but did not read it.  She knows some of the witnesses, about a half a dozen, that's 6.  That she would treat them all the same.  None of them are friends."  Id.

In response to the defense's challenge of Ms. Kirchner, the court explained:

> With respect to [the doctor] she said he's been the family physician for about 15 years although I believe she said she hasn't had an appointment with him for about 8.  The fact that he was a

34

witness, "Would not mean anything." to her and
that's a direct quote.  Although she has respect
for him it still wouldn't mean anything if he
was a witness.  She would not, in terms of being
offended, if he was accused of some wrongdoing
she said that if the State accused him of
wrongdoing she would not hold that against the
State.  If the Defense accused him of wrongdoing
she would not hold that against the Defense.
She would hold that against the Doctor.  She did
not, in any way, indicate that she could not be
fair and impartial.  I don't think there is a
challenge for cause made out either.

Id. at 6.  The court also declined to allow Grega

additional peremptory challenges for use against Hansen

and Kirchner.  On appeal, the Vermont Supreme Court

upheld the trial court's rulings with respect to the

Kirchner challenge and Grega's request for additional

peremptory challenges.  State v. Grega, 168 Vt. 363, 369-

70 (1998).

The Sixth Amendment entitles a criminal defendant to

a trial by an impartial jury.  U.S. Const. Amend. VI;

Irvin v. Dowd, 366 U.S. 717, 723-24 (1961).  "It is

within the trial court's discretion whether to grant or

deny a challenge for cause and a denial of such a

challenge will not support a petition for habeas corpus

relief unless the asserted disqualifying fact was so

prejudicial that the refusal deprived the defendant of a

fundamentally fair trial." Stone v. Stinson, 121 F.
Supp. 2d 226, 239 (W.D.N.Y. 2000) (citing Duran v. Keane,
1997 WL 204312, *2 (N.D.N.Y. 1997)). Under § 2254(d),
the state trial court's conclusion that the jury was
impartial is entitled to a presumption of correctness.
Knapp v. Leonardo, 46 F.3d 170, 175-76 (2d Cir. 1995),
cert. denied, 515 U.S. 1136 (1995) (citing Wheel v.
Robinson, 34 F.3d 60, 65 (2d Cir. 1994)). The Supreme
Court has ruled that "the trial court's findings of
impartiality [may] be overturned only for 'manifest
error.'" Patton v. Yount, 467 U.S. 1025, 1031 (1984)
(quoting Irvin, 366 U.S. at 724).

Here, there is little basis for finding error in the
trial court's rulings. Both Hanson and Kirchner
disclosed their relationships with counsel and witnesses,
and neither displayed evidence of bias, or of an
inability to be fair. The Vermont Supreme Court
concluded that, "[a]bsent some evidence of bias on the
part of the juror, we will not disturb the trial court's
ruling." State v. Grega, 168 Vt. at 370. With no
evidence of "manifest error," this Court should find that
the state courts' rulings were not contrary to, or an

36

unreasonable application of, clearly established federal law. Irvin, 366 U.S. at 724. Furthermore, the Court should conclude that the state courts reasonably determined the facts in light of the evidence, and that Grega has failed to show clear and convincing evidence to rebut the presumption that the state courts' determinations with respect to jury impartiality were correct.

B. Exclusion of Evidence Re: Third-Party Guilt

Grega also claims that the trial court improperly excluded evidence concerning the possible involvement of Comi and Carpenter in the murder. His argument focuses primarily on the trial court's exclusion of evidence pertaining to Comi's prior bad acts, including a history of violent behavior and of sexual aggression towards women. (Paper 107-1 at 8). As reported by the respondent:

> The trial court excluded evidence of prior bad acts and prior convictions offered to impeach. The prior bad acts consisted of evidence that a year before the offense Comi had attempted anal intercourse with his girlfriend, and stopped at her request; that Comi assaulted and threatened his former girlfriend; that a missing pair of hiking boots from a condominium unit being painted was returned after the supervisor warned the painters; and that Comi and Carpenter

preferred Marlboro cigarettes . . . .   The court
also excluded as hearsay Comi's statement to
investigator Wayne Dengler that he had joked
about killing Christine Grega . . . .

Some prior convictions offered to impeach Comi
were excluded because they did not involve
elements of untruthfulness or falsification.
These were convictions for theft of property,
burglary, and battery.   Comi's 1989 and 1990
convictions for forgery and possession of forged
instrument, and 1987 conviction for possession
of stolen property, was excluded because notice
of intent to use these convictions was filed
beyond the deadline established by V.R.Cr.P.
26(c).   The jury did learn at the time of trial,
Comi was residing at the Albany County
Correctional Facility.

(Paper 115-2 at 19-20).   In reviewing Grega's claim on

direct appeal, the Vermont Supreme Court noted that

because Comi and Carpenter both testified at trial, "some

evidence about the two men and their activities on the

day of the murder did come before the jury."   State v.

Grega, 168 Vt. at 374.

Carpenter first stated that he currently resided
at the state correctional facility in St.
Alban's [sic].   He then explained that he had
been working at the condominium complex with
Comi the day of the murder.   He admitted that he
had given police an incorrect address when he
was interviewed the day after the murder.   He
also admitted that he may have been smoking
Marlboro cigarettes the day of the murder.   He
denied murdering or raping the victim.
Carpenter's wife, Daisy Carpenter, testified
that Carpenter came home late on the evening of
September 12, around 8:00 or 8:30 pm.   This

38

contradicted Carpenter's testimony that he
arrived home no later than 7:30 pm.

Comi also testified that he currently resided in
a correctional facility.  He admitted that he
made up an address that he gave police when he
was questioned.  He denied sexually assaulting
or killing the victim, and specifically denied
telling a former girlfriend that he and
Carpenter had broken into a woman's home and
choked her.  He admitted, however, that he may
have joked about sexually assaulting a woman in
the condominium unit.  He further admitted that
he might have joked with Carpenter about killing
a woman, in his girlfriend's presence.  His
testimony on this point was inconsistent,
however; he later stated that he never said that
he had killed a woman.  Comi denied smoking
Marlboro cigarettes but admitted that, at the
time in question, he typically bought Marlboros
for his girlfriend.

Id. at 374-75.

The state court excluded evidence largely on the

basis of Vermont's evidentiary rules.  On direct appeal,

Grega argued that the trial court had erred under both

Vermont law and under the Sixth Amendment to the United

States Constitution.  Id. at 374-79.  The Vermont Supreme

Court disagreed.

In his current petition for habeas corpus, Grega

submits that the trial court's application of the rules

of evidence, and particularly Rule 404, was overly rigid.

He argues that there was "substantial evidence" to show

that Comi was "more likely to have committed this crime than Grega was," and that the excluded evidence was, therefore, relevant to his defense.  (Paper 107-2 at 17). In support of his argument, Grega cites <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302-03 (1973) for the general proposition that "it is unconstitutional for a trial court to rigidly apply the rules of evidence concerning third party culpability."  (Paper 107-2 at 16).[6]  Grega also cites Second Circuit law to support his claim that similar acts evidence usually presents no risk of prejudice.  (Paper 107-2 at 17) (citing <u>United States v. Aboumoussallem</u>, 726 F.2d 906, 911-12 (2d Cir. 1982)).

On direct appeal, the Vermont Supreme Court upheld the exclusion of this similar acts, or "propensity" evidence under Rule 404(b).  The court concluded that, "at best," Grega's evidence showed that Comi had once grabbed his girlfriend by the windpipe, and had "occasionally engaged in or sought to engage in anal

---

[6]  The <u>Chambers</u> case discussed application of the hearsay rule, and stated that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice."  410 U.S. at 302.

intercourse . . . .  This evidence is not nearly strong enough or distinctive enough to show that [this conduct] . . . constituted Comi's 'signature.'"  State v. Grega, 168 Vt. at 377.

The Vermont Supreme Court also concluded that "[m]uch of the evidence that defendant sought to introduce was weak, and often entirely unrelated to the facts of Mrs. Grega's death."  State v. Grega, 168 Vt. at 377.  As an example, the court cited the defense's efforts to show that Comi and Carpenter had been suspected of stealing a pair of boots from one of the condominium units.  "[N]othing was stolen from the Gregas' condominium, so there is no reason why evidence tending to show that the two men were thieves would be relevant."  Id. at 378.

The Vermont Supreme Court further dismissed Grega's effort to paint "a picture of a compelling defense pointing to Comi and Carpenter as the actual perpetrators."

> In fact, as the court recognized, much of this story falls apart when defendant's concrete evidence is examined.  Defendant established no direct link between the two men and the crime of which he was accused.  Instead, as the court noted, he merely gathered together 'a number of

41

> remote acts, unsubstantiated statements, and
> unconnected activities or proclivities' in an
> unsuccessful attempt to implicate Comi and
> Carpenter.

Id. at 378.  With respect to Comi and Carpenter's

criminal records, the state courts barred this evidence

on the basis of a Vermont rule requiring that notice of

an intent to use such evidence for impeachment requires

notice seven days prior to trial.  V. R. Civ. P. 26(c).

The state court also found that "the value of Comi's

theft, burglary, and battery convictions did not

substantially outweigh their prejudicial effect."  State

v. Grega, 168 Vt. at 379 (citing V.R.E. 609(a)(2)).

Grega argues that the state courts violated rule set

forth in Chambers by "mechanistically" applying the

evidentiary rules.  (Paper 120 at 41).  Grega also cites

the Supreme Court's recent decision in Holmes v. South

Carolina, 126 S. Ct. 1727 (2006).  Id.  Holmes compared

"rules that serve no legitimate purpose or that are

disproportionate to the ends that they are asserted to

promote" with "well-established rules of evidence [that]

permit trial judges to exclude evidence if its probative

value is outweighed by certain other factors such as

unfair prejudice, confusion of the issues, or potential

to mislead the jury." 126 S. Ct. at 1732. With respect
to the latter category, the Court found that "[s]uch
rules are widely accepted, and neither petitioner nor his
*amici* challenge them here." Id. at 1733. As to the
former category, the Court struck down a South Carolina
law that allowed state courts to focus on the strength of
the prosecution's case, rather than "on the probative
value or the potential adverse effects of admitting the
defense evidence of third-party guilt." Id. at 1734. In
reaching this conclusion, the Court stated that the
purpose of procedural rules should be "to focus the trial
on the central issues by excluding evidence that has only
a very weak logical connection to the central issues."
Id.

Grega does not argue that any of the Vermont rules
applied in this case fail under the Holmes analysis. In
fact, in each instance the trial court, and the Vermont
Supreme Court on appeal, reviewed the probative value of
the evidence and the likely prejudicial effect. As the
Vermont Supreme Court found, much of the barred evidence
was "weak, and often unrelated" to the crime at issue.
168 Vt. at 377. And as the respondent appropriately

notes, the Holmes decision even cited Grega's appeal as an example of a case in which the courts applied the sorts of rules that are "widely accepted."  126 S. Ct. at 1733 n.*.

Accordingly, Grega cannot claim that the Vermont courts unreasonably applied clearly established federal law.  Nor has he shown that the state courts unreasonably determined the facts in light of the evidence presented. I therefore recommend that Grega's petition for a writ of habeas corpus be DENIED.

## Conclusion

For the reasons set forth above, I recommend that Grega's amended petition for a writ of habeas corpus (Paper 62), filed pursuant to 28 U.S.C. § 2254, be DENIED.  I further recommend that Grega's motions to dismiss two of his claims (Paper 117 and 118) be GRANTED, and that this case be DISMISSED.

Dated at Burlington, in the District of Vermont, this 30th day of July, 2007.

/s/ Jerome J. Niedermeier
Jerome J. Niedermeier
United States Magistrate Judge

Any party may object to this Report and Recommendation within 10 days after service by filing with the clerk of the court and serving on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See Local Rules 72.1, 72.3 & 73.1; 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b), 6(a) and 6(e).